Please be seated. 311-658 Susan Zalesky, a promise by Robert Sheridan and Richard Berg v. Florido, and E. F. Lee v. Richard Hardin. Mr. Sheridan? I want to thank the court for the opportunity to address it today on behalf of Susan Zalesky and for the opportunity of participating with your honors in not only a decision which we hope will give justice to them, but will give good law to the people of the state of Illinois. In this case there are a number of significant issues that run, in our belief, beyond the four corners that were of this particular case. And as I talk about the case, I would like to talk about those issues as well. We have three issues presented to the court in our appeal. And as a guy who is always accused of doing things backward, I will take them in reverse order. The first issue that I want to talk about therefore, your honors, is the one of overemphasis. Mr. Hardin, the attorney for the defendant, is a good man as well as a good lawyer. And it pains me to have to talk about his conduct in the terms of quote unquote misconduct, which is the way in which these things are always talked about in the decisions. I think this is completely inappropriate. And I think it misfocuses the judges and the courts and the people who read opinions on something. It misfocuses in a wrong place. It misfocuses a sense of blame on a lawyer who is trying to do a good job on behalf of his client. And may or may not, that's the issue, have crossed the line. A line which, in fact, is always moving. Because where that line is, whether or not comments or things have been prejudicial, whether or not they have denied a fair trial, is something that changes with every case. In this case, which we argue is a very close case, the line is narrower. In other cases, perhaps, where the evidence is clearer, an attorney could say more without fear of damage. But the point that I would ask the court to consider in considering this issue is not to think about this in the case of misconduct, of what Mr. Hardin did or did not do wrong, but in the case of fairness. Whether or not what he did, his presentation, was sufficient to warrant relief. If we think about it that way, we will divorce the issue from a stigma that should never have been there to begin with. And in thinking about it that way, I think that the way that the case was conducted was done in such a way that it warrants relief under the circumstances of this case. There were motions in limbo, and those were denied. And so Mr. Hardin had the opportunity to talk about other medical issues, prior medical history, general medical condition. He did talk about those. He asked questions about those. He raised them with a number of different witnesses. He argued them strongly in his closing statement. The question is, was it too much? None of those things really related to what we know to be a central and undisputable fact in the case that Mr. Schaefer let out. He died of a gastric bleed. Was there too much emphasis? In a sense, this is only a decision that only your honors can make in consideration of all the record. But it's not whether or not – Mr. Hardin and 99% of the attorneys that are in his shoes was not out to deprive anybody of a fair trial. He was out to make the strongest case he could. The question is, did he cross the line? Well, in connection with that, we have another issue that I'm sure he will mention and I want to talk about. That's the question of whether or not this particular issue was waived. In the trial court and in this court, the defense has spoken of a case called Gotsky v. Raja. And Gotsky v. Raja is a case which held that as a strict and unalterable rule that unless an objection is revoiced as soon as the matter arises at trial, then that matter is forever waived and forfeited. That's indeed what this Gotsky case says. And it's a rule which your honors did not write and your honors need not adopt. And I think that it's a very bad rule. I would ask your honors to disagree with it. And not only is it a very bad rule in general, but there are a number of additional reasons why it shouldn't be applied to this case. If I may speak to a moment about the Gotsky case. If your honors look at the decision as it appears in Northeast Second, you will have no intimation of the fact that there were two Gotsky opinions in that one. The first Gotsky, but if you look at the Supreme Court's website where they enlisted, you'll find that several months earlier there was also a Gotsky v. Raja opinion which was withdrawn. That opinion was withdrawn because on page 13, in beginning to talk about the matters of waiver of forfeiture, the panel wrote that all these claims of forfeiture had been advanced, but the appellant had filed a reply and confessed. That wasn't true. The appellant had filed a reply. The court had lost it. So that when the court became, and your honors can take judicial notice of all the contents of the records of the appellant court, so this isn't something off the street. The opinion that they fashioned kept everything, but the argument that had been advanced in the reply brief, instead of saying there wasn't a reply brief, they took that argument, the case of I believe it's called Sperka v. County of Cook, and said that's bad law. Now this case that they speak of as bad law is one that did not have a hard and flexible and variable rule. It rather said that it is clear that from the eliminating proceedings that the trial court would not entertain and was fully aware of the issues, it would not entertain or revisit them, that it was not necessary to raise the matter again. Let me ask you, in the context of this case, certainly you're trying to prove, as part of your case, medical negligence in attacks on a client, right? True. But one other thing you're trying to prove, and that is damages. True. And so you're going to ask the jury to put a value on the proceedings filed. In a way, the loss, it's actually the loss. How long he would have lived otherwise. So to some extent, his condition is relevant, right? Agreed, Your Honor. So now you've got a denial of a motion in limine. Yes. And so they said, no, they can talk about these things. But then it seems like if your argument is, well, okay, they talked, but they went too far, at that point, that motion in limine being a certain interlocutory order, then it's time to object to the trial court, to give the trial court a chance to say whether he is going too far or isn't. Well, Your Honor, I think the point is very well taken, but if I can return just a second to the point I was making, that doesn't mean that you need to object the very next instant, like this Gostin case says. Your Honor is suggesting that it becomes appropriate to object when it becomes appropriate to object, which is something, you know, which is quite different. The real force, the real teeth of these arguments, we submit, didn't become clear until the closing argument. And we know something else also. Not only did the judge carefully consider the motions in limine, but she would not change her mind. We know this from her ruling in the post-trial motion, because at that time she revisited those motions in limine and stated clearly that she thought that she was right with respect to Dr. Binney. He was going to talk about this in the context of the life expectancy. She thought that was okay. With respect to the other things, she thought that it was relevant to the issue of Mr. Schaefer's stability, which she thought was a very important issue in the case, so that she would have, indeed, ruled the same way. And everybody on our side was pretty confident of that. Now, with respect to whether or not this is a good rule, you know, this hard and fast rule, that you've got to do this, let's consider the context in which it's invariably going to arise. Let's assume that this is the rule. And let's assume now that, just like in the Guski case, they had argued these motions in limine literally for days, literally for days. And that now the first, when does the first time it come up? It comes up in the opening statement, right? So right in the middle of the opening statement, now the counsel for the moving party has got to get up and object in the opening statement. The jury thinks he's rude, or she's rude. And then what happens? The judge then denies the motion. Here she's got to sit down. Let me ask you, is your beef here that not that the evidence came in, but that then it was overemphasized? Overemphasized, sure. And so you're not saying it wasn't inadmissible? Well, no, I don't know. Maybe it was, but our point in the appeal, Your Honor, is correct, is that at the end of the day when the smoke clears, simply much too much, too much, too much had been made of it. So the jury in retiring simply had concluded that this guy was so sick that, you know, what was going to happen? Nothing good could happen to him. He didn't die because Dr. Florida had a miscue. He died because he was just too sick to go on. And first of all, the law prevents, the Holting case prevents such an analysis. And secondly, it just wasn't true. He was a sick guy, but he wasn't as sick as that. And he was entitled to every day that he would have been entitled to. So we're asking Your Honors to examine the issue of whether or not this went too far, not to worry about whether or not there was anything blameworthy, but rather to look and analyze and see whether or not it ended up being, in Your Honor's opinion, unfair. And just as the Guski case declined to follow the Spurko case, I would ask Your Honors to take a stand for good reason and justice and decline to follow the Guski case. I'd also add that Guski was decided after this case had closed, so nobody had any idea that Spurko wasn't going to be applied anymore. Point one. Point two, Your Honors, involves the hearsay question. Counsel, in his brief, says that we had taken irreconcilable positions in claiming that the evidence in the case was too weak to support a verdict and on the alternative that this was a closed case. Though there actually are different alternatives, but they're alternatives. They can't both be true, but one or the other could be true. The judge, as Your Honors I'm sure know, stated at the conclusion of the post-trial motion that it had been up to her, she might have decided the case differently. Quite rightly, that's not the standard for granting a new trial, but I think it tells us something. I think it tells us that this case meets the closed case definition. Counsel, you have two minutes. So I don't know what to do with that, Judge. It meets the closed case definition, and the hearsay evidence in this case that somebody, some nurse or another, had told her the doctor, this Dr. Piccaro becoming the next day, became the central point of the case. It's argued repeatedly in the briefs, and it came from, started being as a belief, and went on to being argued in the appellee's very brief that the issue before the jury was whether or not, and I'm going to quote from page 12, the jury could find it was not a breach of standard care to avoid the risk of sending the plaintiff's decedent to Riverside Hospital when there's going to be a gastroenterologist there the next day. But there is no competent evidence there was going to be a gastroenterologist there the next day. The judge, in denying the post-trial motion, her analysis said, well, what difference does it make? Because Mr. Schaefer was dead by the next morning. The gastroenterologist wouldn't have been able to help him. But that's not the right analysis. I've got 30 seconds left, because here is the right analysis. Okay. The right analysis is this. What is the reasonable duty of care of a doctor in assessing the risk of taking Mr. Schaefer the 45-minute drive to Kankakee when, A, he knows the gastroenterologist is going to be there the next day, or when, on the alternative, he's never contacted a gastroenterologist. The record shows nobody contacted a gastroenterologist, and there was no evidence that anybody was going to be there the next day. I submit that that changes the whole case for the jury, and a close case like this requires a new trial. Thank you, Your Honor. Questions? Any questions? No? Okay. Thank you, Mr. Sheridan. Mr. Harden. Thank you, Your Honor. May it please the court, counsel. This was a hard-fought case with three expert witnesses on each side. This is a patient who survived 22 hours after my client learned that he had a gastric bleed. He made it until 6.32 the next morning. Overnight, while he was in the intensive care unit at Iroquois Memorial Hospital, which is the accusation of wrongdoing that he should not have been in the intensive care unit, but which was denied, the nurse made no phone calls to Dr. Florido until 6 a.m., 32 minutes before he passed away. At the 6 a.m. phone call, the overnight nurse, Nurse Shields, told Dr. Florido that it appeared to her that the patient was in a stable condition. Dr. Florido left two orders, complete blood count, and to type and cross-match two additional units of blood if they were going to be needed. And then Dr. Florido did not hear from the nurse until after the patient was already dead at 6.32. What the nurse, Nurse Shields, testified to was that at 6.25 a.m., the patient's heart monitors started to drop. The nurse then testified that between 6.25 and 6.32, the heart monitor dropped to a condition of asystole, or flatline, and at that point the patient was pronounced dead. From those events, the plaintiff elected to file and try a case against my client, Dr. Florido and Iroquois Memorial Hospital, in which they made accusations not only about the last 24 hours of the patient's life, but also about the last eight days of the patient's life. If your honors look at the plaintiff's jury instructions, specifically the issues instructions, they lay out the accusations of wrongdoing. They asked the jury to find Dr. Florido, and by virtue of an employment relationship, my other client, Iroquois Memorial Hospital, negligent because they did not provide timely and appropriate follow-up care after laboratory results eight days before his death were abnormal. The next accusation of wrongdoing was that my client was negligent because the patient was not immediately hospitalized after those laboratory results eight days before his death were abnormal. What my client did in those eight days was not to hospitalize this patient, who was a 53-year-old man in a nursing home because he had cerebral palsy and needed skilled nursing care for his difficult-to-control diabetes. What my client did during those eight days was very much criticized by the plaintiff's experts and was very much approved by the defense experts. It was indeed necessary to talk about all of the orders that my client left for this patient to be done by the skilled care nursing home until one day before his death and all of the orders that he left for the nurses to carry out in the acute care hospital where Mr. Schaefer was a patient for the last 22 hours of his life. The plaintiff's accusation of wrongdoing on my part has nothing to do with the issues in this case that the jury decided. Remembering, as we all remember, that there is a jury instruction telling the jurors that they must decide that there was negligence, that there was injury to the decedent, and that there was approximate connection between the negligence of the defendant and the injury, we know that it is perfectly acceptable in defense to call witnesses who will testify about everything that the defendant did that bears on the issue of why the patient needed medical care and why the patient may have passed away. Here, there are some very specific items of evidence that I think will bear and assist your honors in deciding why it is that this patient passed away and how it is that the jury could decide that the plaintiff did not prove all three of those required elements of the burden of proof. With the laboratory studies, Dr. Florido described how he began the patient on prednisone because he thought the patient might have a condition called temporal arteritis. He talked about how the patient had kidney disease and what he did to check to see if there was anemia caused by a specific acute problem or if it was a chronic problem. And Dr. Florido testified to the results of these tests and why he felt that the patient had anemia of chronic disease. He testified about why he felt that this patient did not need to be hospitalized, but yet he could be monitored in the skilled care nursing home that was his home for a number of months before all of these events happened. Finally, he also talked about the x-ray tests that he ordered during those days that he was having the patient monitored and why he decided, after a phone call from one of the nurses, Nurse Korovu, who testified, why he decided on the evening of the 5th of March, two nights before the patient passed away, about 36 hours before his death, that this patient needed to be admitted to the hospital as a direct admit the next morning. Nurse Korovu testified about how she started an IV that night because the patient was weak, he was dehydrated, his blood sugar was very high, and so the patient was indeed admitted for that weakness problem the next morning. Dr. Florido talked about how he learned for the first time once the patient was admitted that morning, 22 hours before the patient passed away, that this patient had a bloody stool, that it was felt to be a significant bloody stool that required immediate transfusion, which Dr. Florido ordered, and he testified about the patient's blood sugars that day, he testified about the effect of those blood sugars on the patient's well-being, and he talked about the patient's hemoglobin, among other laboratory studies. As the transfusion was given over that day, in the 22-hour to about 10-hour range, before the patient passed away, the patient's hemoglobin gradually improved. Then we get to the next allegation of negligence in plaintiff's jury instruction. Failed to evaluate, diagnose, and treat his ulcer, resulting in continued bleeding and death from hemorrhage, failing to obtain a gastrointestinal evaluation, and failing to arrange for transfer. On this issue, Dr. Florido and the two experts who weighed in on this, from the defense side, Dr. Schlesinger and Dr. Osborne, talked about Defense Exhibit 7. Defense Exhibit 7 was a statement of policy that requires that before somebody is going to be transferred, before you're going to let them out of your hospital into an ambulance, you must certify that they are stable for transfer. And Dr. Florido and the two expert witnesses on the defense side talked about why Dr. Florido was not able to certify, in his mind, that the patient was stable. I actually give the quotation in my brief of Dr. Florido's answer on that exact topic. He did not feel that the patient was stable for a 45- to 55-minute ambulance ride to Kankakee because of these conditions, that being the low hemoglobin, the high blood sugar, the patient was just finishing up his second transfusion of blood. Dr. Florido felt that this patient was safer in the intensive care unit at Iroquois Memorial Hospital rather than being in an ambulance for a 45- to 55-minute ride. That is the evidence from which this jury could find that Dr. Florido met the standard of care. And since we are talking about an abuse of discretion standard in deciding whether a new trial is warranted based on manifest weight of the evidence, the question we have to ask at this point in the appeal is, is the opposite conclusion clearly evident? Was the jury unreasonable? Were they arbitrary? Did they make their decision not based on evidence? We absolutely proved through the testimony of Dr. Florido, Dr. Schlesinger, Dr. Osborne, that there was evidence saying that this patient was not in a stable condition to be certified as stable for placing into an ambulance. The issue of the consultation that Dr. Florido put into the chart in two different places is as follows. He wrote in his history of physical examination and testified at trial about how his plan was that the patient should be referred to a gastroenterologist as soon as he is stable, as soon as that patient is stable. In the order section, he testified about, and we had the nurse who took the order off testify, that there would be a GI consult. And then someone wrote in on the orders, and the jury saw all of this, Dr. Bokhari. Now remember, this is from 2000 when all of these events happened, March 6th of 2000. The trial took place 11 years later in February of 2011. When we called the nurse, Nurse Dreher, D-R-A-Y-E-R. I notice she's misspelled in some of the plaintiff's filings. Nurse Dreher was the nurse who was on duty when this order for the consultation was placed in the chart. She did not remember the specifics 11 years before of the conversations surrounding this particular order. What she did do was she testified to the normal custom and practice for how an order for a gastroenterology consultation is carried out. She said that the normal procedure is that the unit secretary will contact the consultant. So in this case, the unit secretary would have the job of calling Dr. Bokhari's office. The procedure was also that if the consultant was unavailable, someone would call back and notify Dr. Florido, the ordering physician, and then the ordering physician could decide what to do from there. We know from Dr. Florido's testimony in the adverse examination that the jury heard very early on in the trial from plaintiff's attorney asking the following question, was essentially asking Dr. Florido about this consultation. Dr. Florido answered at page 9 of his adverse examination, I think I was told Dr. Bokhari is coming to the hospital the next day. Plaintiff's attorney asked the question, the next day? The answer was yes. That came in, introduced by the plaintiff's attorney. We did not object. Plaintiff's attorney did not ask for a sidebar. Plaintiff's attorney did not ask for any striking of this testimony. From that answer that came in, elicited by my opponent, we would be entitled to argue Dr. Florido's state of mind. It's been called hearsay in the briefs by the plaintiff, but it is not hearsay. I gave your honors in my brief the quotation from Cleary and Graham, where it is not offered for the truth of the matter asserted. It is only offered for the state of mind of the actor. That is Dr. Florido. He acted as a consequence of hearing. I think I was told Dr. Bokhari is coming to the hospital the next day. Question, the next day? Answer, yes. Whether Dr. Bokhari was going to come to the hospital the next day is not of significance. There's not an accusation of wrongdoing about that. The accusation of wrongdoing is, what did Dr. Florido do? Did Dr. Florido act as a reasonably well-qualified physician in deciding that this patient should remain in the hospital overnight, in the intensive care unit, as opposed to risking a transfer? The jury heard from three different witnesses, Dr. Osborne, Dr. Schlesinger, and Dr. Florido. He did not feel that the patient was so stable that a transfer should be risked. Your Honor, for those reasons, we ask that you affirm the jury's decision and find that there has been no abuse of discretion. There is evidence upon which this hard-fought case could have been won by the defense, and it was. I'd be happy to answer any questions, Your Honors. I have a quick question. Yes, ma'am. In terms of opening the door to the other medical conditions issues, from my understanding of the record, didn't the plaintiff inform the jury that he had cerebral palsy, that he had diabetes? They introduced records from the nursing home that he didn't always follow doctor's advice. He liked to cheat a little. Yes, that came in through Nurse Cora, whose testimony the plaintiffs witnessed. So would you speak to whether you overemphasized that information in your closing argument? Your Honor, the definition of overemphasized I find extremely squishy. You can use whatever word you would like to use. I mean, I don't want to use the word misconduct. Counsel's points are well taken. But to me, if that information was presented to the jury, it's fair game. And I'd like you to speak to that. Yes, Your Honor. Thank you. Your Honor is correct that if there is a claim of negligence that is a broad claim of negligence, an appellate court would be doing a great disservice to trial attorneys by making an overemphasized rule. But what I mean by that is that when someone makes an accusation of negligence, there's a reason that the cases talk about attorneys having wide latitude to make reasonable inferences from the evidence. And that is exactly what we did in our defense. You do have the right to talk about the things that a physician did when a physician is accused of negligence for not hospitalizing someone eight days before they die and for not appropriately taking care of that patient over those eight days before they die. You need to be able to give the jury the full context of what the defendant did. And then in closing argument, it's your job as the attorney to explain why you think those things are consistent with the standard of care and merit a verdict on your behalf. I just say the overemphasized argument from my opponents here is an impossible standard. Thank you. Thank you very much, Your Honors. Thank you, Mr. Hardin. Mr. Burke, you're doing well. Thank you, Your Honors. Good afternoon. Just to pick up, Your Honor, with the last topic that you were inquiring about, our point is not that there wasn't some proper basis for the jury hearing about the fact that Mr. Schaefer had prior conditions, but the overemphasis in connecting it to the cause of death. Our allegation, one of our bases for negligence was that Mr. Schaefer should have been admitted because of abnormal lab results on February 29th. We never claimed that those abnormal lab results were a cause of death, but rather he endured a period of about eight days thereafter when he was suffering when he should have been in a hospital. But what the separate basis for negligence was the failure to timely… You said it was part of a survival plan? Yes, precisely, Judge. And therefore, our second claim then was a wrongful death resulting from the failure to timely obtain a gastroenterology consult. So the overemphasis that we speak of results from connecting up the prior health conditions with Mr. Schaefer's death, and when in reality there was no expert testimony linking those up. So that's why we say that by time of closing argument it became so prejudicial that it warrants reversal. Moving to a couple other points, Your Honor. Dr. Osborne, one of the defendant's own retained experts, specifically testified that Mr. Schaefer was in fact stable enough to be transferred. That testimony is in the record in Volume 3 at page 75. So their own retained expert acknowledged in court that he was okay, sufficiently stable. So I disagree with Mr. Hardin on that point. And Dr. Florido, the defendant, also acknowledged to me on the stand that he never engaged in this analysis as to Mr. Schaefer's stability. He acknowledges, no, I didn't go through all these factors that Mr. Hardin was suggesting to the jury had taken place. So that simply didn't occur. Nurse Dreher, and what you have to understand here, Judge, is that Nurse Dreher actually wrote the order for a GI consult. And I'm not saying there's anything wrong with that, but she charted GI consult. Nurse Dreher admits she never at any time talked to Dr. Bakari or any other gastroenterologist to know that one was coming in. There is no basis in this case for Dr. Florido to have been allowed to testify. Well, that came in under plaintiff's examination. Did you move to strike it after he answered? Judge, number one, that question, my question, that was a volunteered answer. Okay, so my question was, did you move to strike it? I did not move to strike it at that time. It was a nonresponsive answer, volunteered, and contained hearsay. I did, and I did object to it when it was brought up on the defendant's direct examination, and it was different testimony, more substantive, because then Dr. Florido was literally saying, a nurse told me he's coming for sure the next day. Well, were they trying to prove that he was coming the next day? Yes. Or were they just trying to prove that Dr. Florido thought he was coming the next day, and that's why he did what he did? Judge, it turned into a fact that he was coming the next day, and that became literally the cornerstone of the defense, because the issue was timeliness of the gastroenterology consult. Everybody in the whole case, defense experts included, acknowledged they needed a gastroenterology consult. The issue and the lack of negligence, according to our claim, was the failure to get it timely, and that's why it becomes so important, because Dr. Florido had no idea if a gastroenterologist was really coming or when he was coming. There was no appointment or conversation with one to confirm that. Let me just ask, even after that volunteered answer, then you followed up, instead of moving the strike, you followed up with yes the next day, and he said yes, so you drew it out some more. No, because my question had been, Judge, it's correct to say that you knew that on March 6th, neither Dr. Bakhari nor any other gastroenterologist would be coming to Iroquois Hospital. My point is, there's a whole day going by the day he's admitted, March 6th, when Dr. Florido knows there's no gastroenterologist coming into this hospital to see this patient. So my point in my follow-up comment was clarifying or drawing the distinction between not March 6th, you are now saying the next day. Now, yes, I should have objected at that time, and I did the next time it came up. But, Judge, I don't believe you can permit this exchange where a defendant volunteers a nonresponsive hearsay answer to then open the door to further testimony allowing double hearsay to come in. What you're doing, if you permit that, Judge, you are rewarding a defendant for volunteering a nonresponsive answer in front of a jury, and that is just plain unfair and improper, because I can't prevent what he's going to say. If the doctor would have said, I didn't do whatever because a little bird told me that the brother's male was coming to the hospital tomorrow, that's not hearsay, is it? Well, it is, Judge, because it's going beyond just his general intent. And to go hearsay that's admissible for the purpose of state of mind is just to show a general intent. This got elevated and taken as a linchpin of the defense to the point of literally, in closing argument, Mr. Hardin says, Dr. Fiorito entered this order saying GI consult because he had been told by one of the nurses that a gastroenterologist is coming the next day. So what the jury is then hearing is that Dr. Fiorito has made arrangements for a gastroenterology consult the very next day when no such thing had taken place. And that was the kindliness, Judge. Did you argue that to the jury? And that becomes important when the real issue here is the timeliness of getting a gastroenterology consult, because our expert said he had to either get a gastroenterology guy in there that day or transfer him once he was stable. And so it goes to the timeliness, Judge, which was really the point here in the negligence. And as it played out, obviously it wasn't timely. Thank you. And unless your honors have any other questions, I thank your honors for your courtesy and your attention. Okay. Thank you, Mr. Burke. Thank you all for your arguments here today. And that will be taken under advisement. The disposition will be issued right now. The court will be in brief recess for a panel meeting. Court is now in recess.